Clemente K. **FERGUSON**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 01–CF–1402.

District of Columbia Court of Appeals.

Argued Oct. 7, 2004.

Decided Jan. 13, 2005.

Thomas L. Dybdahl, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Jeffrey R. Ragsdale, and Rikki D. McCoy, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

This case raises the question as to whether the trial court erred as a matter of law in finding that the government did not violate aspects of the discovery rules set forth in Super. Ct.Crim. R. 16, and if the trial court did err, whether the error was harmless in light of its decision to provide the defense with an opportunity to seek appropriate relief, which the defense declined to do. Appellant Clemente K. Ferguson was indicted on multiple charges, including armed robbery, attempted robbery while armed, first-degree felony murder while armed, and first-degree premeditated murder while armed. Although he was acquitted of these charges, he was convicted of the lesser included charge of voluntary manslaughter

while armed (of Michael McDonald); assault (of Kionta White) with intent to commit robbery while armed; assault (of Kionta White) with intent to kill while armed; possession of a firearm during a crime of violence; and carrying a pistol without a license. He claims on appeal that the trial court erred by not finding violations of Rule 16 by the government with respect to its expert medical witness. We hold that the trial court erred as a matter of law in finding that the government did not violate Rule 16(a)(1)(E) by failing to provide the defense a written summary, and related information, pertaining to the testimony of the expert that it planned to use for its case-in-chief. We also hold that the trial court erred by concluding that the government did not violate Rule 16 when it failed to provide notice to the defendant in a timely manner that its medical expert would give testimony at trial different from that which he orally conveyed to the defense approximately one and one-half weeks prior to trial. However, we affirm the trial court's judgment of conviction because we conclude that the trial court's error regarding the government's Rule 16 violation was harmless since the court provided an opportunity to the defense to seek appropriate relief, which defense counsel declined to do.

## FACTUAL SUMMARY

The record shows that the charges against Mr. Ferguson grew out of a drug-related matter. Kionta White and Michael McDonald traveled to New York to purchase marijuana laced with PCP in order to sell it within the District. Upon their return from New York by way of an interstate bus, they discovered that Mr. White's car had a flat tire. Mr. White made some telephone calls and eventually made contact with his friend, Mr. Ferguson. Mr. Ferguson picked the two men up and began to drive them toward Mr. McDonald's home in the Northeast quadrant of the District. According to trial testimony by Mr. White, during the drive, Mr. Ferguson and Mr. McDonald discussed the purchased drugs and the amount of money to be made on their sale. Eventually Mr. Ferguson stopped the car, and he and Mr. McDonald got out and went to the trunk of the car. Mr. White heard a gunshot, exited the car and walked to the rear of the vehicle. He saw Mr. McDonald "on the ground ... lying on his face" with a bullet wound to the back of his head.

Mr. Ferguson had a gun in his hand, and approached Mr. White. Mr. Ferguson "got real close to [Mr. White] ... [and] put the gun at [his] head." Mr. White "asked him what he was doing" and "moved [Mr. Ferguson's] hand out [of] the way." Mr. Ferguson "pulled [the gun] towards [Mr. White's] chest area" and began "patting [him] down," asking, "Where's it at, where's it at[?]" Mr. White pushed Mr. Ferguson and "ran across the street." Mr. Ferguson shot him and Mr. White "felt the pressure ... in [his] back as [he] was going across the street." Mr. White "got shot two more times." He "tripped over [a] curb ... and [he] stopped." Mr. Ferguson "caught up with [him]." The two men "started wrestling ... in the grass, the dirt." Mr. White ended up "on the ground, on [his] back" with Mr. Ferguson on top of him. Mr. Ferguson hit Mr. White with the gun [a]bout three times." Mr. White was able to get up and began to run in the direction of a Safeway store. He heard "about two more shots," kept running, and eventually "passed out."

Mr. Ferguson testified in his own defense. He stated that after he picked up Mr. McDonald and Mr. White and began driving, Mr. McDonald told him to stop the car. Mr. McDonald and Mr. White got

out, went to the back of the car and asked Mr. Ferguson to open the trunk. Mr. Ferguson exited the car and opened the trunk with a key. Mr. McDonald "pulled out a gun" and Mr. Ferguson thought Mr. McDonald "was going to kill [him][or] . . . rob him." Mr. White was behind Mr. Ferguson. Mr. Ferguson took the gun away from Mr. McDonald. Mr. White "pushed [him][and] "[t]he gun [went] off." Mr. White was "right on top of [Mr. Ferguson]." Mr. Ferguson "turn[ed] around and sho[ ]t the gun at [Mr. White]. Mr. White "ran across [the] street." Mr. Ferguson followed him and asked what he was doing." Mr. Ferguson was frightened and thought Mr. White would kill him because of a prior incident between Mr. White and another man about one and one-half years earlier when one of Mr. White's friends had "put a gun to [another man's] head." As Mr. Ferguson and Mr. White fought on the ground and the gun "fell out of [Mr. Ferguson's] hand," Mr. White got away from Mr. Ferguson "and ran down the street." Mr. Ferguson left the scene in his car.

## ANALYSIS

Mr. Ferguson contends that "[t]he government's actions in this case essentially breached every requirement of [Super. Ct.Crim. R.] 16(a)(1)(E)." He maintains that "[n]otice of the [government's] expert's actual opinions was not written, nor was it timely." He insists that during defense counsel's pre-trial interview with Dr. Anderson, he said "his trial testimony would be that four of the five gunshot wounds were front-entry wounds." He complains that he was not aware that the medical expert's testimony would differ from that conveyed in the interview with defense counsel until mid-way through the actual trial, after the expert's lunch-time examination of Mr. White. He states that the government orally informed him after

the examination that Dr. Anderson would testify at trial "that only one of the shots was a front-entry wound." He also argues that "[i]n wrongly finding that there was no Rule 16 infraction whatsoever, the [trial court] abused [its] discretion." And, he asserts that the trial court's "refusal to impose any sanctions on the government here was error."

In response, the government insists that it complied with the Rule 16 discovery requirements in June and August 2000, and on January 10, 2001, "supplemented its discovery response by sending a letter to defense counsel, which stated that the government planned 'to introduce the medical records of the surviving victim, [Mr. White], and may call a treating physician to discuss those records.'" This was followed by a letter of April 24, 2001, identifying Dr. Anderson as the government's medical expert and indicating that he would "testify regarding the severity of Mr. White's wounds and the medical care he received in the hospital." The government further contends that Mr. Ferguson did not challenge the adequacy of the government's notice under Rule 16 in the trial court, and that because Mr. White's medical records had been sent to defense counsel "months before trial," the government had "no reason . . . to anticipate counsel's claim that the government had violated discovery obligations." In addition, the government argues that Dr. Anderson's "characterization of the wounds only changed with respect to three of the five wounds." While Dr. Anderson told defense counsel prior to trial that "all three shots to Mr. White's arm had entered from the front, . . . when he actually examined Mr. White's arms in person, he discovered that one shot to the right arm had entered from the back, and he admitted that he could not determine how the other two bullets had entered the arms." Further-

more, the government argues that Mr. Ferguson has failed to show that he was prejudiced by the difference in the medical expert's testimony.

■ Super. Ct.Crim. R. 16(a)(1)(E) provides in pertinent part: "At the defendant's request, the government shall disclose to the defendant a written summary of the testimony of any expert witness that the government intends to use during its case-in-chief at trial.... The summary provided under this subparagraph shall describe the witnesses' opinions, the bases and the reasons for those opinions, and the witness' qualifications." *See Reed v. United States,* 828 A.2d 159, 163 and n. 2 (D.C.2003). The trial court may impose sanctions for the violation of this rule. *See* Super. Ct.Crim. R. 16(d)(2) ("If at any time during the course of the proceedings it is brought to the attention of the Court that a party has failed to comply with this Rule, the Court may order such a party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other orders as it deems just under the circumstances."). Where there has been a "failure to make proper disclosure under Rule 16, among the factors which the trial court must consider and weigh are: (1) the reasons for the nondisclosure; (2) the impact of the nondisclosure on the trial of the particular case; and (3) the impact of a particular sanction on the proper administration of justice in general." *Lee v. United States,* 385 A.2d 159, 163 (D.C.1978) (citations omitted).

■ Generally, in reviewing a denial of a request for sanctions, we must ascertain whether the trial court abused its discretion. *See Phelan v. City of Mt. Rainier,* 805 A.2d 930, 942 (D.C.2002) (citing *Kay v. Pick,* 711 A.2d 1251, 1256 (D.C. 1998) (citing *In re Q.D.G.,* 706 A.2d 36

(D.C.1998)) ("We review the trial court's denial of discovery orders for an abuse of discretion."); *see also United States v. Curtis,* 755 A.2d 1011, 1014 (D.C.2000) ("This court reviews a trial court's Rule 16 discovery determination for abuse of discretion.") (citations omitted). The correct interpretation and application of Rule 16, however, is a legal question which we review *de novo* since "[j]udicial discretion must ... be founded upon correct legal principles...." *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991) (citation omitted); *see also United States v. Brown,* 303 F.3d 582, 589 (5th Cir.2002). Moreover, where the defendant is entitled to discovery, and the trial court denies it as well as a request for sanctions, we determine "whether the nondisclosure was prejudicial...." *Jackson v. United States,* 768 A.2d 580, 584 (D.C. 2001) (citing *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

Before examining pertinent legal principles and case law which control our analysis of the Rule 16 issue, we set forth relevant facts. On September 25, 2000, defense counsel sent the government a comprehensive discovery letter covering multiple categories of discovery requests. One of those categories was "expert witnesses" under Rule 16(a)(1)(E). The letter stated in part: "Rule 16 provides that the government must disclose 'the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications." The letter also requested the following information by October 15, 2000, in the event that the government expected to present testimony from an expert witness:

1. Specific notice of the *particular* expert witness that the government intends to call in this case.

2. The opinions the expert will express.

3. The bases for those opinions.

4. The actual CV or resume used by the expert witness, including but not limited to any schooling the expert will purport to have, any special societies to which the expert will purport to belong, and any special training the expert will purport to have.

(Emphasis in original) The letter also listed documents that the government had disclosed to the defense on May 22, 2000, and August 28, 2000, none of which seemingly pertained to testimony by a medical expert. There is no record of a government response until January 10, 2001, when the government sent a letter to defense counsel enclosing additional documents, including the medical records of Kionta White. That letter also identified "several expert witnesses" whom "[t]he government may call ⸳.. at trial." In addition, the letter stated, "the government plans to introduce the medical records for the surviving victim, Kionta White, and may call a treating physician to discuss those records."

On April 24, 2001, six days prior to the suppression hearing in this case, the government sent a letter to defense counsel advising that:

The government plans to call Dr. Bernard B. Anderson, M.D., as an expert medical witness at trial. Dr. Anderson will testify regarding (1) the gunshot wounds suffered by Mr. White on February 25, 2001, (2) the severity of the physical injuries which resulted from those gunshot wounds, and (3) the medical care provided to Mr. White following the shooting.

A copy of Dr. Anderson's resume was enclosed. Dr. Anderson performed surgery on Mr. White and was his treating physician. Shortly after receiving Dr. Anderson's name, defense counsel interviewed him to find out the nature of his forthcoming testimony. At that time, Dr.

Anderson used one diagram in particular to describe the entrance point of bullet wounds that Mr. White suffered. He did not personally prepare the diagram.

Four days after trial began, the defense received word that Dr. Anderson had examined Mr. White that same day and that his testimony would be different from that previously communicated to the defense. The government provided a summary of the changed testimony to the defense around 2:30 p.m. that day. The defense counsel complained to the trial judge and asked the judge to "preclude[ ] the testimony of Dr. Anderson as a sanction for a Rule 16 violation." If the trial court allowed Dr. Anderson to testify, defense counsel advised that it would have to obtain its own expert to examine Mr. White and to testify as to the entrance points of the bullet wounds suffered by Mr. White. In addition, the defense might need to subpoena the doctor who prepared the diagrams that Dr. Anderson had discussed during his interview by defense counsel. The prosecutor stated that the government had not "spent a lot of time being concerned about" the entry points of the bullets into Mr. White's body until after the opening statement by defense counsel when it learned that the defense theory was self-defense, rather than alibi. After hearing the opening statement by defense counsel, the government "felt that it would be helpful for Dr. Anderson to actually examine Mr. White's wounds," but "that couldn't be done earlier because Mr. White was in Maryland and Dr. Anderson was [in the District]." The reexamination was necessary, the government asserted, because of inconsistencies in the medical record as to the location of the entrance point of the bullets. For example, one diagram "shows two wounds to the back, while ⸳... [another] show[s] a single gunshot wound to the back." Furthermore, the govern-

ment emphasized that the conflicting diagrams had been provided to the defense, that it was obvious that Dr. Anderson had not prepared the diagram that he discussed with defense counsel, and that the defense could call the doctors who had prepared the conflicting diagrams.

The trial court took the position that the defense should have an opportunity to question Dr. Anderson about his conclusions following his examination of Mr. White. However, after noting that the medical records had been made available to the defense, the trial judge declared, "I don't see any Rule 16 violation" and denied the defense request for sanctions. Nevertheless, the trial court said to defense counsel, "I may allow you some time to talk to Dr. Anderson before you have to cross-examine him or before he testifies, and perhaps, if you still want to have someone examine Mr. White and have them look at the medical records independently, I might allow you some brief period of time to do that." After further discourse with defense counsel, the trial court stated: "You can talk to the doctor.... I will give you time to do that. But I am not giving you a week. I am not giving you a day, unless you come and tell me something else." The judge explained that, for example, defense counsel could say, "We really think we are prejudiced for the following reasons and I should be able to get an expert to examine Mr. White, because before we didn't think it was necessary because of X, Y and Z, and now we really do think it is necessary because of the new information that is being provided to us by the expert." Defense counsel replied, "Very well, your Honor."

After the next scheduled witness testified, the trial judge called a bench conference, ascertained that Dr. Anderson was to be the next government witness, and inquired whether defense counsel "want[ed] to talk to Dr. Anderson." Defense counsel indicated a desire to have Dr. Anderson examine Mr. White in the presence of the defense attorneys "so we can see what he is talking about at this point." The trial court decided to allow the defense fifteen minutes to speak with Dr. Anderson to see "where you are," and consequently, took a recess. After the recess, Dr. Anderson took the stand as a government witness. One of the areas of questioning related to different diagrams in Mr. White's hospital records showing the entrance points into his body of bullets fired at him. After the prosecutor reviewed these diagrams with Dr. Anderson, and asked him about the differences in the diagrams, the doctor acknowledged that he had examined that day the "torso, arms and back of the victim, [Mr.] White."

Mr. White was then brought into the courtroom to be examined again by Dr. Anderson, this time in front of the jury. The court advised the jury that Mr. White was being "brought in so the Government can ask Dr. Anderson some questions and can demonstrate [Dr. Anderson's] examination of Mr. White." Dr. Anderson acknowledged that one bullet "enter[ed] in the center of the back and exit[ed] out the right side of the back...." Another bullet entered "the back of Mr. White's right arm" and exited at "an area on the top center of Mr. White's bicep." There was also a "second injury in the right upper extremity," with an entrance and exit point. Dr. Anderson was not certain of the exact entrance and exit points for this bullet wound on the inside "upper right forearm of Mr. White." With respect to Mr. White's left arm, there was one gunshot wound to Mr. White's upper left arm, with an entrance point "on the front side of his arm," and an exit point "on the back side of the arm...." A final bullet wound was located in Mr. White's abdomen area, "at the junction of the chest and the abdo-

men"—"above his lower rib cage and several inches below his right nipple and pectoral." Unlike the other bullets, there was no indication that this bullet exited Mr. White's body.

The following day, the defense cross-examined Dr. Anderson. There was no request for a continuance to prepare for the cross-examination. Mr. Ferguson's counsel reviewed what Dr. Anderson had conveyed to the defense about the bullet wounds prior to trial and contrasted that with his testimony at trial during his examination of Mr. White, especially with regard to the entrance and exit points of the bullets. Dr. Anderson acknowledged that at the time of defense counsel's interview with him, he had focused on one diagram from Mr. White's medical records because he "thought this [diagram] perhaps more completely represented [Mr. White's] injuries." He indicated that "[t]here is one [gunshot wound] that was unaccounted for in this diagram," that is, "the bullet [which] entered . . . in the middle of the back . . . and . . . exit[ed] in the middle of the chest . . . on the side. . . ." Dr. Anderson agreed that the bullet wound in the right arm came from the back, but that he could not tell the entrance points for two other arm wounds. On redirect examination, Dr. Anderson maintained that although he had discussed the case both with defense and government counsel prior to trial, "the clarity of [his] observation [after examining Mr. White] was not apparent to [him] at the time of [those] discussions. . . ." When asked whether government counsel had asked "some questions specifically about some of the body diagrams that appear in [Mr. White's] medical records," Dr. Anderson replied, "Yes, you did." When the prosecutor inquired whether Dr. Anderson's "examination . . . of Mr. White, both in the morning and then again . . . in the afternoon [of the previous day] . . . assisted

[him] in [his] ability to render an opinion as to certain entrance and certain exit wounds," he responded: "No doubt about it. It helped me to interpret several of the diagrams. . . ." At the end of the redirect examination of Dr. Anderson, there were no defense motions.

Dr. Anderson's testimony was addressed during closing argument by the defense and by the prosecutor primarily during rebuttal. The defense essentially attacked the credibility of Mr. White and sought to establish the defense of self-defense. Defense counsel briefly mentioned Dr. Anderson's testimony:

> Dr. Anderson was here for quite some time explaining that Mr. White definitely had one gunshot wound to the front clearly, and that's the bullet, [the] doctor said rested in his chest area. That he had two wounds that the doctor could say were distinctly back wounds and that was one in the back and one at the top. But that there were two other wounds that he could not account for as . . . entering from the back or the front.

> Had Mr. White been shot as he wanted you to believe that he was shot in the back as he is running away from Mr. Ferguson, the medical evidence would have shown that. And the reason why it doesn't show that . . . is because you cannot believe Kionta White about how things unfolded that night.

The prosecutor in closing argument emphasized Mr. White's testimony and focused on the encounter between Mr. White and Mr. Ferguson, and mentioned Dr. Anderson's testimony briefly—pointing out that according to Dr. Anderson, Mr. White was shot five times. However, in rebuttal the prosecution paid more attention to Dr. Anderson's testimony, stating:

> What did Dr. Anderson tell you? He said I looked at the medical records,

then I looked at Mr. White. I had the ability to actually look at Mr. White. He could tell that Mr. White was shot from the back, in the center of the back, a shot from the back and one shot to the upper left arm, but definitely from the back.

Then he told you there were two other wounds from the left arm to the right arm. He said he couldn't tell, they could be from the back, they could be from the front. But remember, Mr. White is running as he is being shot. So one minute this is in the back of the arm, the other minute it's the front of the arm. It doesn't really matter whether it's the front or the back. We know that he was shot as he was running away.

Having set forth the factual basis for our analysis of this case under Rule 16, we turn to the applicable case law and legal principles. We have not previously decided a case with the precise factual circumstances which characterize this case. In *Reed, supra,* a case involving possession with intent to distribute drugs, the government "substantially complied" with Rule 16(a)(1)(E) "when it sent defense counsel its discovery letter stating that it was going to present an expert" and setting forth "the substance of the expert's testimony and the basis for the opinion that the expert would offer." *Id.* at 163. The letter was sent ten months prior to trial, and the government conveyed the names of two possible drug experts but indicated that scheduling difficulties precluded identifying the witness until just before trial. *Id.* at 161. The defense received the witness' resume before the *voir dire* of the

expert, and we decided there was no violation of Rule 16. *Id.* at 163–64. Furthermore, neither *Curtis, supra,* nor *Jackson, supra,* concerned material discoverable under Rule 16(a)(1)(E). And, *Lee, supra,* not only pertained to an earlier version of Rule 16, but also did not involve the subsection pertinent to expert witness testimony.

United States Courts of Appeals, however, have addressed the comparable Fed. R.Crim.P. 16(a)(1)(E), relettered in 2002 as 16(a)(1)(G).[1] *See* Fed.R.Crim.P. Advisory committee's notes regarding the 2002 amendments to the rules. Rule 16(a)(1)(E) is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed.R.Crim.P. Advisory committee's notes regarding the 1993 amendments to the rules.

 "The duty to disclose under Rule 16 is triggered by a proper request." *United States v. Crass,* 50 F.3d 81, 83 (1st Cir.1995) (citations omitted). Here, defense counsel through its letter of September 25, 2000, made a specific and detailed Rule 16(a)(1)(E) request to the government, asking for "the particular expert witness" to be called at trial, "[t]he opinions the expert will express," "[t]he bases for those opinions" and the resume of the expert, "including but not limited to any schooling the expert will purport to have, any special societies to which the expert will purport to belong, and any special training the expert will purport to have."

---

1. Fed.R.Crim.P. 16(a)(1)(G) provides in pertinent part:

 At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial .... The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

The government claims it substantially complied with Rule 16.[2] It first mentions discovery provided to defense counsel in June and August of 2000, without indicating how it complied with Rule 16. Our review of the record shows that on May 22, 2000 and August 28, 2000, according to defense counsel's September 25, 2000 letter, the government sent certain documents to Mr. Ferguson's defense counsel. None of these documents, as far as we can tell, relate to the testimony of Dr. Anderson. The government also cites its letter of January 26, 2001, but while that letter identifies other expert witnesses with a one sentence summary of the proposed testimony of each, it does not even mention Dr. Anderson's name, and states only: "[T]he government plans to introduce the medical records for the surviving victim, Kionta White, and may call a treating physician to discuss those records." The January 26, 2001 letter clearly did not comply with Rule 16(a)(1)(E).

■ Next, the government maintains that it was in substantial compliance with Rule 16 when it sent a letter of April 24, 2001, on the eve of trial, to defense counsel identifying Dr. Anderson as its medical expert and pointing out that he would "testify regarding (1) the gunshot wounds suffered by Mr. White on February 25, 2001, (2) the severity of the physical injuries which resulted from those gunshot wounds, and (3) the medical care provided to Mr. White following the shooting." Although the letter specified the subject areas of Dr. Anderson's proposed testimony, it did not comply with Rule 16(a)(1)(E) because it could not be interpreted, even remotely, as a "written summary" of the

testimony the doctor would give at trial. Nor did that letter "describe [Dr. Anderson's] opinions," let alone "the bases and the reasons for those opinions," as Rule 16(a)(1)(E) requires.

■ Not only did the government not comply with Rule 16(a)(1)(E) prior to trial, but it also failed to comply with the rule in a timely manner during trial when it became obvious to the government that Dr. Anderson's testimony would not be consistent with what he related to defense counsel during a pre-trial interview. The government's oral conveyance of Dr. Anderson's changed views did not comply with the requirement of a written summary of his testimony. In explanation of its delayed announcement of the change in Dr. Anderson's opinion, the government states that it did not realize Mr. Ferguson would raise a defense of self-defense until the opening statement for the defense. But four days elapsed between that opening statement and the government's decision to have Dr. Anderson examine Mr. White. During that four-day period the government was silent about its Rule 16 obligations. The government asserts that Dr. Anderson was unable to examine Mr. White earlier because Mr. White was in Maryland and the doctor in the District. This certainly does not excuse the government's violation of Rule 16, and there is no indication on this record that the government made any effort to get Dr. Anderson to Maryland or to bring Mr. White to the District at an earlier point in time. Nor does the government's assertion that, "[b]ecause [defense] counsel had received the medical records [of Mr. White] months before trial," and had been given the sub-

---

2. The government claims that Mr. Ferguson did not "challenge the adequacy of the government's written expert notice [in the trial court], and does not challenge it on appeal." Our review of the record satisfies us that Mr.

Ferguson has preserved the issue of the adequacy of the government's Rule 16(a)(1)(E) notice regarding medical testimony to be presented by the government.

ject areas of Dr. Anderson's proposed testimony, show substantial compliance with Rule 16. Mr. White's medical records contained entries from medical personnel other than Dr. Anderson, and while Dr. Anderson operated on Mr. White, he did not examine him when he was first admitted to the hospital; nor did he prepare any of the diagrams showing the location of the bullets that entered Mr. White's body. Consequently from these records the defense could not have divined the nature of Dr. Anderson's testimony with respect to the entrance and exit points of the bullets that struck Mr. White. And, there was a clear difference between Dr. Anderson's pre-trial interview opinion that all three arm bullet wounds entered from the front of Mr. White's body, and his trial testimony that one gunshot wound to the arm entered from the back and the entry points for the other two could not be determined. In light of the factual context of this case, the trial court erred by finding that the government did not violate Rule 16.

█ Having concluded that the trial court erred by finding that the government did not violate Rule 16, we turn to the more difficult questions as to whether Mr. Ferguson was prejudiced by the government's failure to comply with Rule 16, or whether that failure warrants reversal of Mr. White's convictions and a new trial. In addressing these questions, we must determine the "likelihood that the verdict would have been different had the government complied with the discovery rules"; *United States v. Mendoza,* 244 F.3d 1037, 1047 (9th Cir.2001), or whether "the remedy offered by the [trial] court was inadequate to provide [Mr. Ferguson] with a fair trial," *United States v. Lopez,* 271 F.3d 472, 483 (3d Cir.2001) (quoting *United States v. Miller,* 199 F.3d 416, 420 (7th Cir.1999)) (internal quotation marks omitted). Regardless of how the standard is

phrased, however, in the final analysis we must be satisfied that the defendant was not substantially prejudiced. *Jackson, supra,* 768 A.2d at 584; *Lopez, supra,* 271 F.3d at 483; *see also Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239 ("But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." If "the error itself had substantial influence ..., or if one is left in grave doubt, the conviction cannot stand.").

█ Although the trial court in this case erred in finding that the government did not violate Rule 16, and rejected the defense request to impose sanctions on the government, it nevertheless decided to "allow [the defense] some time to talk to Dr. Anderson [prior] to cross-examin[ation] ... and [perhaps] ... to have someone examine Mr. White and have [that person] look at the medical records independently...." The trial court specifically informed defense counsel that the time allowed to speak with Dr. Anderson would not be "a day" or "a week" "unless you come and tell me something else." The court further described what defense counsel should say to it in requesting additional time, as follows: "We really think we are prejudiced for the following reasons and I should be able to get an expert to examine Mr. White, because before we didn't think it was necessary because of X, Y and Z, and now we really do think it is necessary because of the new information that is being provided to us by the expert." Defense counsel took no issue with the trial court's pronouncement, simply saying, "Very well, your Honor." The record shows no request from the defense for additional time to obtain its own medical expert after this colloquy with the trial

court, even though it was surprised by the change in Dr. Anderson's opinion. Rather, just before Dr. Anderson was scheduled to take the stand, defense counsel asked that Dr. Anderson examine Mr. White in the presence of the defense attorneys "so we can see what he is talking about at this point." The record reveals that this examination took place in front of the jury as the trial continued with the direct testimony of Dr. Anderson. And there is no indication in the record that defense counsel requested additional time before cross-examining Dr. Anderson. Even though the trial court afforded the defense an opportunity to seek appropriate relief by inviting defense counsel to ask for additional time for preparation in light of Dr. Anderson's changed testimony, provided defense counsel could explain the need for more time, the record clearly shows that defense counsel declined to take the opportunity since no such request was made. Under these circumstances, we conclude that the trial court's error in finding that the government did not violate Rule 16 was harmless.

 Even if the trial court had excluded the key part of Dr. Anderson's testimony or given defense counsel additional time to obtain an independent expert witness, we are satisfied that there would not have been a different outcome in Mr. Ferguson's case, see *Jackson, supra*, 768 A.2d at 584 (citing *Kotteakos, supra*, 328 U.S. at 764–65, 66 S.Ct. 1239), for the following reasons. Even without Dr. Anderson's testimony, there was evidence from which a reasonable jury would conclude beyond a reasonable doubt that Mr. Ferguson was not acting in self-defense when he shot Mr. White; thus, with the exception of a slight delay in the proceedings, there was no "impact of the nondisclosure [of Dr. Anderson's testimony in the form prescribed by Rule 16] on the trial of [Mr.

Ferguson's] case" and no "impact" on the fairness of Mr. White's trial, see *Lee, supra*, 385 A.2d at 163. Government witness Jeanetta Spencer, who was acquainted with Mr. McDonald from the neighborhood, looked out the window of her apartment on the night in question. She saw an Escort car. The driver (Mr. Ferguson) and a passenger (Mr. McDonald) exited the car while another passenger (Mr. White) remained in the car. The two men went to the trunk of the car, opened it, and as Mr. McDonald bent towards the opening in the trunk, Ms. Spencer saw Mr. Ferguson shoot Mr. McDonald in the back of the head with a gun. She also observed the other passenger (Mr. White) get out of the car and run towards the porch of her small apartment building, with Mr. Ferguson running after him. She watched as the two men were "tussling on the ground." Mr. White ran away while Mr. Ferguson "pick[ed] up something off [Mrs. Spencer's] porch" and left in his car. That same night, Clifton Ellison, who lived in the same neighborhood, was awakened by his fiancee who told him, "[t]here is a shooting out front." Mr. Ellison went to the window and saw one man chasing another. One man fired a gun at the other, causing him to fall. Then the two men began "wrestling" on the ground and the man with the gun was "shooting at [the other man]." The man without the gun "got up [and] ran ... towards the Safeway." The man with the gun "ran down and turned back, ... picked up something and went to his car, lifted up the trunk and threw it in the car" and drove away. Yet another resident of the neighborhood, Kevin Smith, "awakened to some loud blasts" on the night in question. He "jumped off [his] couch" onto the floor. "A second later, [he] looked out the window ... and [saw] two guys running past [his] car." "One guy was running behind the other guy, and ... appeared to ... hav[e] a gun

or something like that." He had "a shiny object which appeared to be a gun." Furthermore, Dr. Anderson never wavered in his opinion that one bullet entered Mr. White's back, testimony which reasonable jurors would conclude is inconsistent with Mr. Ferguson's self-defense theory.

From the testimony of these witnesses, and Mr. White's account of how he was wounded, reasonable jurors crediting that testimony would conclude and infer beyond a reasonable doubt that Mr. Ferguson shot and pursued Mr. White, and that Mr. Ferguson did not act in self-defense, all without considering the testimony of Dr. Anderson regarding the entry point of the three arm wounds on Mr. White's body. Consequently, we conclude that under the facts and circumstances of this case, Mr. Ferguson was not substantially prejudiced by the trial court's finding that the government did not violate Super. Ct.Crim. R. 16(a)(1)(E). However, we reiterate what the court said in *United States v. Chastain*, 198 F.3d 1338 (11th Cir.1999): "There is no excuse for violating Rule 16 even when it results, as it did in this case, in no prejudice to the Appellant[ ]." *Id.* at 1348.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*