Matthew L. MURPHY–BEY, Appellant,

v.

**UNITED STATES, Appellee.**

No. 06–CF–907.

District of Columbia Court of Appeals.

Argued Feb. 3, 2009.
Decided Oct. 8, 2009.

Lee R. Goebes, Public Defender Service, with whom James Klein and Jaclyn S.

Frankfurt, Public Defender Service, were on the brief for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Elizabeth Trosman and Jonathan W. Haray, Assistant United States Attorneys, were on the brief for appellees.

Before REID, KRAMER and BLACKBURNE–RIGSBY, Associate Judges.

KRAMER, Associate Judge:

Appellant Matthew L. Murphy–Bey was indicted for assault with intent to kill while armed (D.C.Code §§ 22–401, 22–4502); one count of aggravated assault while armed (D.C.Code §§ 22–404.01, 22–4502); two counts of possession of a firearm during a crime of violence (D.C.Code § 22–4504(b)), each relating to one of the aforementioned offenses; and two counts of carrying a pistol without a license (D.C.Code § 22–4504(a)). At the conclusion of a jury trial, appellant was found guilty of aggravated assault while armed, the related possession of a firearm during a crime of violence charge, and the two counts of carrying a pistol without a license, but acquitted of the other charges.

Appellant argues that the trial court erred in excluding his expert witness' testimony and in denying his request for an instruction regarding the law of the "initial aggressor" in self-defense cases. While we sustain the trial court's ruling regarding the expert witness, we still reverse and remand for a new trial because the trial court erred in declining to give the instruction on "initial aggressor."

# I. Facts

## A. The Government's Version

William "Pete" Armstead, the complainant in this case, testified that appellant, a barbershop owner, was not only a barber but also a drug dealer. Three days before the shooting at issue appellant had asked Armstead to test some crack cocaine for him. After doing so, Armstead had determined that the crack was "good," [1] and he asked to have some on credit. Appellant gave Armstead some crack in exchange for a promise to pay him $45, which they agreed would be paid that coming Friday.

Without disclosing the reason why he needed money, Armstead arranged to borrow the $45 from a neighbor, Paul Davis, who lived in the same apartment building as Armstead. Davis was to pay appellant directly, instead of giving the money to Armstead, because Armstead was worried that if he kept possession of the money, he might spend it elsewhere.

Armstead lived in an apartment on the second floor of his building, but around noon on Friday, the day he was required to pay appellant for the drugs, Armstead went up to an apartment on the third floor to visit with friends, play cards, drink malt liquor and smoke crack and marijuana. Armstead left another neighbor, James Sanford, in his second floor apartment, telling Sanford that he was expecting appellant and to send him up to the third floor if he saw him.

Late that night someone knocked on the door of the third floor apartment. Armstead looked through the peephole, identified appellant, and went out into the hall, closing the apartment door behind him. Appellant asked, "Man, where my money at [?]" Armstead told appellant that he had to get the money from Davis. Appellant

---

1. We assume that this means it got him high.

then "sucker punched" Armstead and caused him to suffer a "busted lip."

Armstead hit appellant hard several times in return, "beat[ing] the shit out of him." Appellant then took one step backward and said, "You bad mother fucker, I'mma shoot you." While Armstead was standing at arm's length from him, appellant put his hand in his pocket and shot through his coat at Armstead.[2] Armstead ran to the stairwell, with appellant following and firing at his head. Armstead put his arm up for protection, and was shot in the arm. After this second shot, appellant fled down the stairs, while Armstead ran up the stairs to the fourth floor and went door-to-door, knocking, for five or ten minutes before going back down to the third floor and re-entering Davis's apartment. There he waited for emergency medical personnel to arrive.

In the course of Armstead's trial testimony, he admitted that on the day he was shot he had been drinking and smoking crack and marijuana. He testified, however, that he was not under the influence of any illegal drugs at the time of his in-court testimony. Armstead also admitted that he had been previously diagnosed as a paranoid schizophrenic. He described the symptoms of his paranoid schizophrenia as follows: "Sometimes I can see shadows. Sometimes I see things that's not even there. I hear voices that don't even be there. Sometimes I be scared of something that I shouldn't be scared of." When he hears voices they say "evil things . . . like somebody is after me and I know it's not nobody after me." He disclosed that he took prescription medications Rimerol and Resporal, one to keep him from hearing voices and one to ease his depression (a symptom of schizophrenia) as well as Benadryl for allergies.

## B. The Defense Version

Appellant testified in his own defense, stating that, contrary to the government's argument, Armstead had actually tried to rob appellant, not the other way around. According to him, at about 10:00 p.m. on the day the events at issue occurred, Armstead called him and requested that he come to Armstead's apartment and cut his hair. A barber and the owner of the Full Effect barbershop for over 18 years, appellant commonly made house calls of this sort for an extra charge, especially on weekend-nights, when people often wanted a touch-up to their hairstyles before going out. Appellant testified that Armstead was a regular customer who usually got his hair cut at Full Effect, but that he had also previously cut Armstead's hair at his apartment building. Appellant testified that because Full Effect was a cash-only business, he sometimes carried a revolver to protect both himself and his business even though he knew it was illegal for him to do so. Thus, upon receiving the call from Armstead, appellant took his hair cutting supplies and his gun with him to the apartment building where Armstead was located.

Appellant testified that he went straight to the third floor apartment, where Armstead had indicated he would be, and knocked on the door. Armstead stepped into the hallway. After a "second or two," appellant realized that Armstead was "breathing real heavy. He was like . . . all bugged out. . . . He looked like he was high or fidgety about something." In response, appellant "backed up off him," that is, "took a couple steps away from him." Armstead then demanded that appellant give him his "M F money," then reached into his back pocket and pulled out a knife. Appellant testified that he backed up fur-

---

**2.** The police found no holes in appellant's coat.

ther because he "didn't want to get stabbed. [He] didn't want to get hurt, and that's when [he] reached for [his] gun." Appellant admitted that he tried to shoot the knife out of Armstead's hand but did not know if he was successful. He shot the gun a second time, he testified, because Armstead continued to charge him. Only then did Armstead run away. Appellant himself then ran down the stairs and away from Armstead.

## II. Expert Witness Disclosure

 To support appellant's argument that he was an innocent victim of what he claimed were Armstead's schizophrenic paranoia and drug-induced rage, appellant sought to introduce testimony from Dr. Deborah Norris, an adjunct professor at American University with a Ph.D in neurotoxicology.[3] Appellant argues that the trial court erred in excluding Dr. Norris's testimony because, contrary to that court's finding, his December 1, 2005 expert witness disclosure letter met the requirements of Rule 16. We disagree.

Because appellant requested that the government make expert witness disclosures under Rule 16, he himself was also required to make similar disclosures to the government under the same rule. Super. Ct.Crim. R.16 (a)(1)(E) and (b)(1)(C) (2008) (both requiring that expert witness summaries "describe the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications"). Thus, appellant was required to provide this information with respect to Dr. Norris's opinions.

In a pretrial letter to the government, appellant stated that he might seek to introduce expert testimony from Dr. Norris, identified her as having a Ph.D in neurotoxicology, and attached her *curriculum vitae*. The letter stated that Dr. Norris "may testify either by providing information or by rendering an opinion about . . . the effects of Crack Cocaine and psychiatric drugs [and] marijuana on the human mind, the combination of their use, the length of time of their effects[,] as well as the long and short-term effects of their use."

In a later letter, the defense attempted to respond to the government's complaint that the original disclosure letter had not been sufficiently specific. The defense represented that "Dr. Norris will be able to offer an opinion that while under the influence of the illegal drug crack cocaine and coupled with the psychotic schizophrenic drugs, a person would be frantic, nonsensical, agitated, overly hyper, and in a state of mania."

The government subsequently filed a motion to exclude Dr. Norris's proposed expert testimony on the grounds that the disclosure did not comply with Rule 16's requirements because "the defense had not revealed the opinions that Norris would offer or the reasons for those opinions, and the government therefore could not anticipate the testimony, adequately prepare for cross-examination, or attempt to obtain an opposing expert." The motions judge ruled for the government, finding that the information provided did not satisfy Rule

---

**3.** On appeal, appellant argues that Dr. Norris's testimony was relevant to helping the jury assess Armstead's credibility. This argument, however, was not raised below and thus we need not address it here. *See, e.g., Hunter v. United States*, 606 A.2d 139, 144 (D.C.1992) ("[P]oints not asserted with sufficient precision [at the trial court level] to indicate distinctly the party's thesis will normally be spurned on appeal.") (citations omitted). Moreover, because we hold that appellant failed to comply with the threshold issue of Super. Ct.Crim. R.16, *see infra*, other potential uses of Dr. Norris's testimony are irrelevant here.

16 because it provided "very little" information from which the government could prepare to face Dr. Norris's testimony. The judge also found that the proposed testimony would not be helpful to the trier of fact because it lacked sufficient evidentiary foundation and because it was not based upon information regarding the types and amounts of drugs that were actually in Armstead's system at the time of the incident or upon information about Armstead's actions at the time of the incident.

During a hearing on the motion, appellant explained that Dr. Norris would be basing her testimony on information obtained from Armstead's hospital records, specifically (1) his self-reported information regarding the amount of alcohol and cocaine that he had ingested that day; (2) when he had last used crack cocaine; (3) how long he had been using crack cocaine; and (4) his prescribed medications. Appellant conceded, however, that (a) Dr. Norris would not be able to testify as to Armstead's behavior at the time of the shooting; and (b) there was "no quantitative analysis of medications or drugs in the [victim's] system immediately following the incident before other medications were prescribed by the hospital," and that "we don't know any amount . . . that was in his system at the time he arrived" at the hospital.

We have held that a party's compliance with its Rule 16 disclosure requirements is a question of law.[4] *Ferguson v. United States*, 866 A.2d 54, 59 (D.C.2005). In *Ferguson*, the government argued that it had substantially complied with Rule 16 through two letters. One letter, without even stating the proposed expert's name, stated only: "[T]he government plans to introduce the medical records for the sur-viving victim, Kionta White, and may call a treating physician to discuss those records." *Id.* at 64. We held that this "clearly did not comply" with Rule 16. *Id.*

The second *Ferguson* letter "identifi[ed] Dr. Anderson as [the government's] medical expert and point[ed] out that he would 'testify regarding (1) the gunshot wounds suffered by Mr. White on [the date of the shooting], (2) the severity of the physical injuries which resulted from those gunshot wounds, and (3) the medical care provided to Mr. White following the shooting.'" *Id.* We held that the second letter also failed to comply with Rule 16 "because it could not be interpreted, even remotely, as a 'written summary' of the testimony the doctor would give at trial. Nor did that letter 'describe [Dr. Anderson's] opinions,' let alone 'the bases and the reasons for those opinions,'" as Rule 16 requires. *Id.*

Appellant's purported disclosure in this case is similarly inadequate. His original proffer is, as in *Ferguson*, a list of topics that fails to summarize the expert's expected testimony, fails to describe the expert's actual opinions, and fails to describe the bases for those opinions. Therefore, this letter cannot be considered an adequate disclosure. *See id.; see also United States v. Duvall*, 272 F.3d 825, 828 (7th Cir.2001) (holding that Federal Criminal Procedure Rule 16, a counterpart to our Rule 16, "requires a summary of the expected testimony, not a list of topics").

Appellant's second letter did not rectify this problem. In that letter, appellant stated that "Dr. Norris will be able to offer an opinion that while under the influence of the illegal drug crack cocaine and coupled with the psychotic schizophrenic drugs, a person would be frantic, nonsensical, agitated, overly hyper, and in a state

---

4. As noted above, see Section I.C., *supra*, the prosecution and the defense are subject to identical disclosure requirements under Rule 16.

of mania." This purported disclosure comes closer to summarizing Dr. Norris's expected testimony and her opinions, but it clearly still does not provide the bases and reasons for those opinions, nor any details of them, and therefore hindered the government's ability to prepare for trial or cross-examine of Dr. Norris. *Cf. Reed v. United States,* 828 A.2d 159, 161, 163 (D.C. 2003) (finding the government had substantially complied with Rule 16 where the discovery letter stated the substance of the expert's testimony and the basis for the opinion that the expert would offer, and "[t]he only thing lacking ... was information about the specific qualifications of the expert," because defense counsel "had the expert's *curriculum vitae* in hand before the voir dire of the expert even began," leaving him "well-armed for a complete voir dire of the expert's qualifications and for later cross-examination"). Therefore, appellant did not comply with Rule 16 and the trial court did not err in so finding.

■■■ Having held that the trial judge correctly determined that appellant did not comply with Rule 16, we perceive no abuse of discretion in his decision to apply an explicitly authorized sanction and bar the inadequately-disclosed testimony's admission. A trial court may impose sanctions for violating Rule 16. Super. Ct.Crim. R. 16(d)(2). Where the court finds a violation, it "may order such a party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other orders as it deems just under the circumstances." *Id.* Sanctions for vi-

olation of Rule 16 are reviewed for abuse of discretion, but the correct interpretation and application of Rule 16 is a legal question which we review *de novo* because "judicial discretion must ... be founded upon correct legal principles." *Ferguson, supra,* 866 A.2d at 59. "Where there has been a failure to make proper disclosure under Rule 16, among the factors which the trial court must consider and weigh are: (1) the reasons for the nondisclosure; (2) the impact of the nondisclosure on the trial of the particular case; and (3) the impact of a particular sanction on the proper administration of justice in general." *Id.* (citation omitted).

■■■ First, the reasons for violation here were not compelling. Indeed, the violation appears to be the result of the defense failing to comprehend the nature of the Rule's requirements, rather than any actual inability to comply with them. Second, the violation would have had a substantial impact on the trial of this particular case, leaving the government unable to prepare adequately for trial without a proper summary of Dr. Norris's proposed testimony, her opinions, and the bases for them. Third, the sanction is in keeping with the proper administration of justice in general. Appellant brought the burden of disclosure on himself by first placing it on the government. The reciprocal nature of this rule must be respected, and neither side should be permitted to hold back on the disclosure of the information without consequences. Therefore, we affirm the trial court on this point.[5]

---

**5.** Because we find no error in the trial court's determination regarding Rule 16, we need not consider appellant's argument that the trial court erred in finding that Dr. Norris's proposed testimony lacked sufficient evidentiary foundation because it was not based upon information regarding the types and amounts of drugs that were actually in Armstead's system at the time of the incident or upon infor-

mation about Armstead's actions at the time of the incident.

We do note, however, that appellant conceded Dr. Norris's inability to testify as to Armstead's behavior at the time of the shooting. Furthermore, there was "no quantitative analysis of medications or drugs in the [victim's] system immediately following the inci-

### III. The "Initial Aggressor" Instruction

■ Appellant requested and received a self-defense instruction. *See* Criminal Jury Instructions for the District of Columbia, No. 5.16 (4th ed.2008). The trial court, however, denied appellant's request for an "initial aggressor" instruction under Jury Instruction 5.16(D), which informs the jury that if a defendant who "provokes a conflict later withdraws from it in good faith, and communicates that withdrawal by words or actions, s/he may use deadly force to save himself/herself from imminent danger of death or serious bodily harm." *Id.* at 5.16(D). The trial judge found that subsection (D) was inappropriate in this case because "nobody says that [appellant] was the aggressor, and then after he began the aggressive conduct that he withdrew." Appellant argues that this constituted error. We agree.

■ Failure to give an instruction embodying a defense theory that negates guilt of the crime charged, when properly requested and supported by evidence, is necessarily reversible error. *Bell v. United States,* 950 A.2d 56, 64–65 (D.C.2008) (quoting *Gray v. United States,* 549 A.2d 347, 350–51 (D.C.1988)). In reviewing claims of instructional errors, we consider the instructions as a whole and in the context of the overall charge. *Rorie v. United States,* 882 A.2d 763, 771 (D.C. 2005) (citations omitted). Jury instructions must "properly inform [the jury] of the applicable principles involved." *Id.* (citing *Hernandez v. United States,* 853 A.2d 202, 207 (D.C.2004)). Thus, a defendant is entitled to a jury instruction on a theory of the case that negates his guilt of the crime charged if the instruction is supported by any evidence, however weak. *Id.* (citing *Graves v. United States,* 554 A.2d 1145, 1147 (D.C.1989)) (quotation marks omitted). That evidence may come from either the prosecution or the defense, or a combination of the two. *Hernandez, supra,* 853 A.2d at 205; *Harling v. United States,* 387 A.2d 1101, 1103 n. 1 (D.C. 1978.). In determining whether a defense instruction was properly denied, we review the evidence in the light most favorable to the defendant. *Bonilla v. United States,* 894 A.2d 412, 417 (D.C.2006) (citations omitted).

■ To be entitled to a self-defense justification, the record must reflect that (1) there was an actual or apparent threat to the defendant; (2) the threat was unlawful and immediate; (3) the defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) the defendant's response was necessary to save himself from danger. *Hernandez, supra,* 853 A.2d at 205. A defendant, however, cannot claim self defense if he or she "was the aggressor or if s/he provoked the conflict upon himself/herself." *Rorie, supra,* 882 A.2d at 772 (citations omitted). That is,

> one who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation. Only in the event that he communicates to his adversary his intent to withdraw and in

---

dent before other medications were prescribed by the hospital," and "we don't know any amount … that was in his system at the time he arrived" at the hospital. We have held that

> the effect of narcotics on credibility cannot be assessed without [1] knowledge of the type of drug involved, [2] the type of reaction it causes, [3] the amount of the drug the witness was using at the time he observed the event in issue, and [4] the mental characteristics of the individual who is testifying.

*Coates v. United States,* 558 A.2d 1148, 1154 (quoting *Durant v. United States,* 551 A.2d 1318, 1328 n. 12 (D.C.1988)).

good faith attempts to do so is he restored to his right of self-defense.

*Id.* (citing *United States v. Peterson,* 157 U.S.App.D.C. 219, 228, 483 F.2d 1222, 1231 (1973)). One does not recover the right of self-defense where one physically withdraws merely seeking competitive advantage in the conflict. *See e.g.,* 55 A.L.R.3d 1000, 1012 (1974) ("Although, in the course of an assault or encounter which the defendant initiated or provoked, he may have backed off or retreated, the courts ... [have held] that his retreat does not necessarily mean an abandonment of the conflict so as to justify him in later injuring or killing his adversary and claiming that it was done in self-defense, where the retreat represented merely a change to a better strategic position and not an attempt to retire from the conflict.").

Appellant argues that a combination of his and Armstead's testimony creates "some evidence, however weak" that, even if he were the initial aggressor, he communicated his intent to withdraw and made a good faith attempt to actually do so. In particular, appellant argues that a jury could believe both Armstead's testimony that appellant came to collect a drug debt and appellant's testimony that he "backed up" when Armstead pulled a knife on him. Thus, he argues, he was entitled to the first aggressor instruction in subsection (D) because his testimony about backing up is some evidence of withdrawal. The government, in contrast, asserts that taking a few steps back in order to avoid being stabbed in a fight appellant started does not amount to a good faith attempt to withdraw, nor a clear communication of an intent to withdraw; rather, the government argues, those steps back were taken to gain a better strategic position to continue the fight that he started.

Here, although the evidence is reasonably susceptible to either appellant's or the government's interpretation, taking the ev-

idence in the light most favorable to appellant, *Bonilla, supra,* 894 A.2d at 417, his testimony that he stepped back from Armstead is "evidence, however weak" that he withdrew. *See Hernandez, supra,* 853 A.2d at 205. Accordingly, whether those steps constituted both a proper withdrawal and a proper communication of that withdrawal was an issue for the jury. *See, e.g., Rowe v. United States,* 164 U.S. 546, 554–55, 17 S.Ct. 172, 41 L.Ed. 547 (1896) ("It should have been submitted to the jury whether the act of the accused, in stepping back and leaning against the counter, not in an attitude for personal conflict, was intended to be, and should have been reasonably interpreted as being, a withdrawal by the accused in good faith from further controversy with the deceased.").

Accordingly, the trial court erred in denying appellant's request for the instruction in subsection (D) and appellant is entitled to a new trial.

For the foregoing reasons, the decision below is

*Reversed.*