*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0723

STEFAN J. FARMER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CF3-002178)

(Hon. Anthony Epstein, Trial Judge)

(Argued April 8, 2025                    Decided August 28, 2025)

*Robin M. Earnest* for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Matthew M. Graves,* United States Attorney at the time the brief was submitted, and *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant United States Attorneys were on the brief, for appellee.

Before BECKWITH, DEAHL, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: Stefan J. Farmer shot his friend, Andre Sturdivant,

and was charged with assault with intent to kill and a variety of related offenses.

Farmer indicated that he would raise an insanity defense. As required by the

Superior Court's rules, Farmer previewed that his expert, Dr. Stephen Lally, would

opine that Farmer met the standards for insanity during the underlying offense. Dr. Lally's opinion was based largely on a separate expert's report—authored by Dr. Teresa Grant—that recounted Farmer's history of hallucinations, psychotic symptoms, repeated emergency hospitalizations around the time of the shooting, and serious mental health diagnoses like bipolar and schizoaffective disorder. That separate expert's report, however, drew no definitive conclusion regarding a potential insanity defense.

The government complained that Farmer had not sufficiently previewed Dr. Lally's expected testimony under the applicable rules. It asked "to be provided a fulsome notice of Dr. Lally's proposed testimony," and barring that, it sought to preclude Dr. Lally from testifying. The trial court agreed that Farmer's expert notice was deficient and, without providing Farmer an opportunity to cure the deficiencies because trial was approaching, the court precluded Dr. Lally from testifying. Now left without an expert, Farmer abandoned his insanity defense.

Farmer argues on appeal that the trial court committed reversible error when it precluded Dr. Lally from testifying. We agree. First, Farmer's expert notice complied with Rule 16's requirements, at least at the time (it has since been amended). At the time of Farmer's trial, Rule 16 required him to provide the government only with "a written summary" of Dr. Lally's "opinions, the bases and

reasons for those opinions, and [his] qualifications." Super. Ct. Crim. R. 16(b)(1)(C) (2017). Farmer's notice checked each of those boxes. The rule did not require Dr. Lally to author a report himself, and Dr. Grant's report was replete with substantial and obvious support for an insanity defense, Dr. Grant's own equivocation on that bottom line notwithstanding.

More importantly, even if we discerned some Rule 16 violation, the trial court's decision to preclude Dr. Lally from testifying, effectively jettisoning any insanity defense, was disproportionate to any Rule 16 violation. There was no reason the trial court could not have afforded Farmer with an opportunity to cure any perceived Rule 16 deficiencies, though we discern none ourselves. The government does not argue that this error was harmless, so we provisionally vacate Farmer's convictions and remand the case for a trial limited to Farmer's insanity defense.

## I. Factual and Procedural Background

*The assault*

The underlying facts of Farmer's assault are not in serious dispute here. Farmer was in his car when Sturdivant, his longtime friend, approached the driver's side of the car to talk with him. The men then got into an argument over two dollars that Farmer had apparently lent to Sturdivant's son, with Farmer insisting that

Sturdivant repay his son's debt. As Sturdivant later testified, Farmer "got mad," "came up with a gun," "pointed it at [him]" and "tr[ied] to open the [car] door." Sturdivant then "kicked [Farmer's] door shut and ran around the opposite side of the car." Grainy Ring doorbell camera footage from a nearby property showed that after a few seconds of the two yelling at each other, during which both of them gesticulate with their arms while a few feet apart, Sturdivant began to walk away from Farmer. A second or two later, Farmer pointed a gun at Sturdivant and shot at him three times, hitting him once in the hand and once in the thigh. As Farmer was firing, Wayne McDaniels, a longtime friend of both of them, "went to [Sturdivant's] aid" and "pushed" Farmer towards his car. Farmer then got back into his car, sat there for about thirty seconds, and then drove away. Farmer crashed that same car into a barrier on a Maryland highway about ten hours later.

After the shooting, Sturdivant hurried away from Farmer. He ducked into a nearby yard and went behind the house for about a minute, and he then came out after Farmer had driven away and a police officer had arrived on the scene. The officer helped Sturdivant bandage his hand, and Sturdivant said that he didn't know who shot him after the officer asked what had happened. Multiple police officers then searched the yard where Sturdivant hid to look for a possible firearm. They ultimately determined that "[t]here was no evidence" that Sturdivant had stashed a weapon in the yard and concluded that only his assailant had a gun.

Police later identified Farmer as the perpetrator and arrested him about a month and a half after the shooting. A grand jury indicted Farmer for assault with intent to kill plus a host of lesser included offenses and related firearm offenses.

*The pretrial motions and hearings on the insanity defense*

Farmer pled not guilty to the charges against him. Early on in the proceedings Farmer notified the court and the government that he was planning to raise an insanity defense. The trial judge—the Hon. Robert Okun at the time—promptly ordered the District's Department of Behavioral Health to conduct a criminal responsibility examination.

Dr. Teresa Grant conducted that exam. The exam involved several interviews with Farmer, his mother, and his sister and an analysis of his medical history. Dr. Grant's report documented Farmer's diagnoses with bipolar, schizoaffective, and major depressive disorders, and it further detailed his history of substance abuse. Dr. Grant's report also noted how Farmer was hospitalized for serious mental health issues on four separate occasions in the month after the underlying assault and before his arrest. At least one of these hospitalizations was prompted by an emergency petition and involved police transporting him to the hospital. During those hospitalizations, Dr. Grant described how Farmer "was found to be hallucinating, paranoid, [and] delusional with no insight and impaired judgment." Farmer reported

at the time of these hospitalizations that he "did not feel safe at home as he [was] being watched and listened to" and "was thinking that people were out to harm [him]." Dr. Grant further documented the results of Farmer's various medical evaluations, which focused heavily on Farmer's problems with "medication compliance" for his psychiatric illnesses—medical providers educated Farmer on the importance of taking his medication, helped him obtain refills for a variety of drugs, and encouraged him "to resume psychiatric treatment on an outpatient basis."

After detailing Farmer's extensive mental health issues, Dr. Grant concluded that she was unable "to form a definitive opinion" regarding the insanity defense. Dr. Grant listed a host of reasons for her uncertainties, and despite everything in the above paragraph seeming to weigh in its favor, the principal counterweights were that (1) Farmer's substance abuse seemed just as likely to be at the root of his mental health problems as his psychiatric disorders, and (2) he appeared to have "goal directed" behavior during the underlying incident, an apparent reference to the fact that he was trying to recoup his two dollars. In a particularly confusing double negative, Dr. Grant wrote that it "appears highly unlikely that Mr. Farmer's behaviors were not significantly compromised by the presence of a mental disease or defect." In her concluding paragraph, Dr. Grant said that "the data provided and reviewed does not provide sufficient evidence for the evaluator to form a more definitive opinion as to whether Mr. Farmer actually suffered from a qualifying

mental disease or defect that significantly compromised his capacity to make choices," with the caveat that "there are indicators that he appreciated the wrongfulness of his actions."

After Dr. Grant issued this report, Farmer notified the court and the government that he intended to call her and Dr. Lally as experts in support of his insanity defense. That initial notification came in a motion to bifurcate the trial into separate guilt and insanity phases. Farmer explained that Dr. Lally had "evaluated Mr. Farmer" and had independently evaluated all the records and information that Dr. Grant had reviewed, and that Dr. Lally's expert opinion was that "Farmer's behavior was significantly compromised by the presence of a mental disease or defect and therefore lacked criminal responsibility." The trial court granted Farmer's motion to bifurcate the trial into separate guilt and insanity phases, and further ruled that "if the jury finds [Farmer] guilty [at] the first phase on the merits," a "separate jury" would be empaneled "to hear the insanity phase" to avoid any prejudice from the guilt phase bleeding into the insanity phase. The court also directed the parties to exchange Rule 16 summaries of their experts' proposed testimonies by January 17, 2023, with the initial guilt phase of trial scheduled to start on February 27, 2023.

Farmer timely provided his expert notice indicating that he intended to call both Drs. Grant and Lally in support of his insanity defense. Farmer's Rule 16 notice, with Dr. Grant's report attached, stated as follows:

> The defense expects that both Dr. Grant and Dr. Lally will testify consistently with the report generated by Dr. Teresa Grant. *See* attached. Specifically, both Dr. Lally and Dr. Grant will testify that they have concluded that to a reasonable degree of psychological certainty, Mr. Farmer lacked the substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law due to mental disease or defect. In sum, this is because (1) Mr. Farmer has been diagnosed with bipolar disorder, schizoaffective disorder, and major depression, among other things, and (2) there is no way to determine whether Mr. Farmer was actually under the influence of a narcotic around the time of the offense. For more details, please refer to Dr. Grant's attached report.

The government responded with a motion to compel a written report from Dr. Lally or to otherwise preclude him from testifying. The government argued that Farmer had not sufficiently provided "a written summary of any expert testimony that [he] intend[ed] to use as evidence at trial," and that the summary Farmer did provide failed to "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Super. Ct. Crim. R. 16(b)(1)(C) (2017). In the government's view, Farmer's expert notice was "nothing more than a recitation of the applicable legal standard, followed by two generalized conclusions that Dr. Lally has supposedly reached."

Farmer filed an opposition arguing that he had already complied with Rule 16's requirements and that the rule did not require Dr. Lally to author an independent report. Farmer nonetheless substantially supplemented his previous Rule 16 notice in various respects. Farmer more exhaustively detailed Dr. Lally's qualifications—which had never been questioned—including by providing his twelve-page CV. Farmer reiterated that Dr. Lally had reviewed the same materials as Dr. Grant—providing a bullet-pointed list of dozens of records and materials that he reviewed and the government already possessed—and flagged that Dr. Lally had conducted five of his own clinical interviews with Farmer, plus additional interviews with his mother and sister. Farmer further highlighted half a dozen specific portions of Dr. Grant's report that supported Dr. Lally's assessment, including that (1) in the weeks after the shooting Farmer was hospitalized for mental health crises multiple times, (2) during those hospitalizations Farmer was found to be "hallucinating, paranoid, delusional" and to have "no insight and impaired judgment," (3) while Farmer had been treated for psychotic symptoms in the years prior to the shooting, he had not received "adequate psychiatric treatment" for his psychoses, and (4) Farmer suffered from "Major Depression, Bipolar Disorder, and Schizoaffective Disorder."

The day after Farmer filed that opposition, the trial court held a status hearing. Judge Okun indicated that he was "not going to require [Farmer to] provide a report"

and he did not identify any respects in which Farmer's expert notice was apparently deficient. Judge Okun explained that he would leave any further questions on those topics to the Hon. Anthony Epstein, to whom the case was being reassigned for the upcoming trial. Judge Okun directed the parties to "be prepared to address before Judge Epstein whether" Farmer's Rule 16 notice was "sufficient under the rules." Judge Okun then set an additional status hearing thirteen days later, on February 16, before Judge Epstein.

At that February 16 hearing—now eleven days before the guilt phase of trial was scheduled to begin—the trial court (Judge Epstein from here on out) explained that in response to the court's queries, Dr. Grant had recently corrected the confusing double negative in her report.[1] Dr. Grant made clear that what she meant to say was that "it appears highly unlikely that Mr. Farmer's behaviors were ~~not~~ significantly compromised by the presence of a mental defect," omitting the "not" from her initial report. Defense counsel stated that in light of that redaction, she would no longer be calling Dr. Grant as an expert during the insanity phrase of the trial, and instead would rely on Dr. Lally as the sole defense expert.

---

[1] The parties were privy to and consented to the court's communications with Dr. Grant seeking clarification of the offending sentence in her report.

The trial court then considered the government's pending motion to compel a more thorough report from Dr. Lally or to otherwise exclude his testimony under Rule 16. The court acknowledged that the "rules don't require a[n expert] report," but opined that Dr. Lally's testimony was largely based on an error in Dr. Grant's report that she had since corrected. In the court's view, that reliance on Dr. Grant's report "doesn't work" because with her correction in mind, she "did not opine nor did she explain the reasons and basis for an opinion that" Farmer lacked the ability to "conform his conduct to the requirements of the law or to recognize the wrongfulness of his conduct." The trial court also added that Dr. Grant's report listed various factors that are "inconsistent with an insanity defense." For those reasons, the trial court ruled that Farmer had not complied with his Rule 16 obligations to identify the bases of Dr. Lally's expert opinions.

The trial court then cut straight to the appropriate sanction. The court observed that, when fashioning a sanction, it had to weigh "(1) the reasons for the nondisclosure; (2) the impact of the nondisclosure on the trial of the particular case; and (3) the impact of a particular sanction on the proper administration of justice in general." *Murphy-Bey v. United States*, 982 A.2d 682, 689 (D.C. 2009) (quoting *Ferguson v. United States*, 866 A.2d 54, 59 (D.C. 2005)). Taking those factors into account, the trial court precluded Dr. Lally from testifying. The trial court reasoned that Farmer had "no good reason" for his failure to provide "reasonable detail about

the specifics of [Dr. Lally's] opinion . . . even though [the] trial was relatively imminent." The trial court added that Farmer had "ample opportunity" to provide additional details about Dr. Lally's testimony earlier in the litigation, but with the trial "now only ten days away," any further delay would unjustifiably delay the upcoming trial and negatively affect the court's schedule. Notably, while the guilt phase of trial was scheduled eleven days out, Dr. Lally's testimony was relevant only to the insanity phase of trial, which was not scheduled for any particular date but was to trail the fairly lengthy guilt phase of trial. Farmer indicated that he could not proceed with his insanity defense without his expert, and so the anticipated insanity phase of trial was cancelled.

*The trial*

With the trial now narrowed down to the question of Farmer's guilt, defense counsel's opening statement posited that Farmer had acted in self-defense after Sturdivant "shoved" the car door on him and reached for his own firearm before Farmer beat him to the punch and shot Sturdivant first. Defense counsel theorized that Sturdivant's firearm was never recovered only because he was able to stash it in the yard where he hid after being shot.

The government, on the other hand, presented a fairly overwhelming case that Farmer had not acted in self-defense and that Sturdivant had no firearm. It relied on

the Ring camera footage as well as the testimony of Sturdivant and two additional witnesses: McDaniels, the heroic man who pushed Farmer after he shot at Sturdivant, and Tyrone Phillips, who rushed to the scene from a block or so away after hearing the gunshots. Sturdivant identified Farmer as the man who shot him, testifying that he was hit after he "went around the other side of [Farmer's] car" and "backed up with my hands up." Sturdivant testified that he was not armed on the day of the shooting and did not hide a gun anywhere afterwards, which was corroborated by Phillips and McDaniels, who testified that they did not see him with a gun that day. The defense presented only one witness of its own, an officer who had responded to the scene of the shooting, found Sturdivant in a side yard, and suspected that he might have stashed a gun somewhere. Farmer himself did not testify, nor did any other witness claim to see Sturdivant with anything resembling a gun.

At the close of evidence defense counsel asked for the jury to be instructed on self-defense, arguing that there was enough evidence that he acted in self-defense for the jury to decide that question. *See generally Hernandez v. United States*, 853 A.2d 202, 205 (D.C. 2004) ("[A] defendant is entitled to a jury instruction on a theory of the case that negates his guilt . . . if the instruction is supported by any evidence, however weak." (quoting *Graves v. United States*, 554 A.2d 1145, 1147 (D.C. 1989))). The trial court denied that request concluding "there is no evidence

on the record that, under the circumstances as they appeared to him at the time of the incident, Mr. Farmer could reasonably believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by firing his handgun at Mr. Sturdivant." The mere fact that Sturdivant had an opportunity to stash a gun in the side yard was no basis for a self-defense instruction, the trial court reasoned, where no gun was ultimately found and there was nothing beyond pure speculation to suggest that Sturdivant ever had one.

About an hour into jury deliberations, the jury sent a note asking, "Is there a jury instruction or definition of self-defense?" The trial court reversed course in response and decided to instruct the jury on self-defense. The newly issued instruction informed jurors that Farmer had a right to act in self-defense if he had an actual and reasonable belief that he was in imminent danger of death or serious bodily injury. But if the jurors found that "Farmer was the aggressor or provoked imminent danger of bodily harm upon himself, he cannot rely upon the right of self-defense to justify his use of force." The court then gave each of the parties an additional ten minutes to make supplemental closing arguments to the jury regarding self-defense. The defense argued that Sturdivant "aggressively" "kicked closed the [car] door" that Farmer "sat behind," and that the video shows that Sturdivant "reached for his waistband" before Farmer shot him. The defense also highlighted Sturdivant's criminal history and emphasized that it was the government's burden

to disprove self-defense beyond a reasonable doubt. For its part, the government emphasized that the footage shows Farmer shooting Sturdivant "three times" "as he's turned and walking away," that "[t]here is no evidence that Mr. Sturdivant had a gun at all," and that Farmer sat in his vehicle for about thirty seconds, seemingly unafraid of any potential retaliation.

After brief further deliberations, the jury found Farmer guilty of the bulk of the charges against him. It acquitted Farmer of the lead assault with intent to kill charge but convicted him of its lesser included offense of aggravated assault while armed, along with a host of related offenses. The trial court sentenced Farmer to seventeen years of imprisonment, and Farmer now appeals.

## II. Analysis

On appeal, Farmer argues that (1) the trial court erred in determining that Farmer failed to provide a sufficient summary of Dr. Lally's testimony under Rule 16; (2) the trial court abused its discretion by imposing a Rule 16 sanction that completely precluded Dr. Lally from testifying; and (3) the trial court erred in initially declining to give a self-defense jury instruction on the basis that there was insufficient evidence to support that defense. We address the first and second arguments together, and then turn to the third.

*A. The trial court erred when it precluded Dr. Lally from testifying*

We review de novo whether a party failed to comply with their Rule 16 obligations. *Miller v. United States*, 115 A.3d 564, 566 (D.C. 2015) (Rule 16 compliance is a question of law). If there is a Rule 16 violation, we review a trial court's choice of sanction for abuse of discretion. *Id.* In conducting that review, we consider whether the trial court's chosen sanction rested on a "firm factual foundation" and whether "the reasons given reasonably support[ed]" its sanction. *Johnson v. United States*, 398 A.2d 354, 364-65 (D.C. 1979) (internal quotation marks omitted).

In a nutshell, we agree with Farmer that his expert notice satisfied his Rule 16 obligations. And to the extent there was some deficiency in that notice, the extreme sanction of precluding Dr. Lally from testifying—effectively precluding Farmer from presenting his central defense to the charges against him—was disproportionate to the perceived infraction. Where Rule 16 compliance was at least a close question and Farmer had not been given any opportunity to cure any perceived deficiencies, the trial court's decision to entirely preclude Dr. Lally from testifying was an abuse of discretion. We now elaborate on those points.

### i. Farmer complied with Rule 16's notice requirements.

At the time of Farmer's trial, Rule 16(b)(1)(C) required Farmer to disclose to the government, upon request, "a written summary of any expert testimony that [he] intend[ed] to use as evidence at trial." Super. Ct. Crim. R. 16(b)(1)(C) (2017).[2] That summary had to "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."[3] *Id*. The central purpose of Rule 16 notice is to give parties an adequate preview of opposing experts' opinions so that they have a chance to prepare for cross-examination and the presentation of their own case. *Miller*, 115 A.3d at 568. This in turn "minimize[s] surprise that often results from unexpected expert testimony" and "reduce[s] the need for

---

[2] Farmer's obligation to comply with the government's request was triggered by Farmer's own request for the government's Rule 16 disclosures. *See generally Murphy-Bey*, 982 A.2d at 687, 689 (describing Rule 16's "reciprocal" obligations, and noting that once the "appellant requested that the government make expert witness disclosures under Rule 16, he himself was also required to make similar disclosures to the government under the same rule").

[3] Rule 16 was amended in September 2023, several months after Farmer's trial. D.C. Super. Ct. R. Promulgation Order 23-05 (July 12, 2023, eff. Sept. 29, 2023). Those amendments mirrored changes to the federal rule that had taken effect the previous year and required parties to provide more detailed notice than under the rule's prior iteration. Rule 16 now requires defendants to provide, among other things, "a complete statement of all opinions that the defendant will elicit from the witness in its case-in-chief." Super. Ct. Crim. R. 16(b)(1)(C)(iii). These amendments were to address "the lack of adequate specificity regarding what information must be disclosed" in the prior Rule 16. *See* Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment.

continuances." *Ferguson*, 866 A.2d at 63 (quoting Fed R. Crim. P. 16 (advisory committee notes to 2002 amendments)). At its core, Rule 16(b)(1)(C) promotes fairness and efficiency at trial.

Farmer argues on appeal that contrary to the trial court's ruling, he provided a sufficient summary of Dr. Lally's proposed testimony under Rule 16 through the combination of (1) defense counsel's January 17, 2023, notice letter; (2) the attached report from Dr. Grant; (3) Farmer's opposition to the government's motion to compel; and (4) Dr. Lally's attached CV.

We agree that Farmer complied with Rule 16's requirements under the prior iteration of that rule. First, Farmer had clearly notified the government that Dr. Lally would opine "to a reasonable degree of psychological certainty" that "Farmer lacked the substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law due to mental disease or defect." Second, the bases for Dr. Lally's opinion were adequately disclosed when Farmer indicated that he was relying upon Dr. Grant's report and further highlighted specific portions of that report that substantiated his insanity defense. While Dr. Grant herself could not form a definitive opinion about whether Farmer satisfied the insanity standards, her report was overflowing with information that could clearly supply a basis for an insanity defense. That included facts that Farmer specifically highlighted as forming

the bases of Dr. Lally's expert opinion, like (a) Farmer's serious mental health diagnoses ranging from bipolar to schizoaffective disorder, (b) Farmer's repeated emergency hospitalizations in the mere weeks following the shooting, that (c) Farmer was found to be "hallucinating, paranoid, delusional," and to have "no insight and impaired judgment" during those hospitalizations, and (d) Farmer's lack of adequate treatment to address his longstanding psychoses. Third, and finally, it is undisputed that Farmer provided an adequate description of Dr. Lally's qualifications, which have never been questioned. That all checks the boxes of "a written summary" of Dr. Lally's "opinions, the bases and reasons for those opinions, and the witness's qualifications." Super. Ct. Crim. R. 16(b)(1)(C) (2017).

The trial court's contrary conclusion seemed to stem largely from two analytical missteps. The first relates to the trial court's reasoning that because Dr. Grant fixed the double negative in her report to make clear that she was not opining with any certainty that Farmer met the standards for insanity, that somehow meant Dr. Grant's report could not serve as a basis for Dr. Lally's own expert opinion. That's wrong. There is nothing peculiar at all about two experts diving into the same set of information and drawing different conclusions from it, particularly as to matters of degree like the likelihood that somebody suffered from insanity at a particular time (where Dr. Grant could not form a definitive conclusion, Dr. Lally was more confident). Dr. Lally was relying on the contents of Dr. Grant's

report and the history she had compiled, but he was bringing his own expertise to bear on that history, independent from whatever conclusions Dr. Grant drew. *See Burke v. Scaggs*, 867 A.2d 213, 219 (D.C. 2005) ("The function of an expert witness is to utilize his or her skill, knowledge, and expertise to render an opinion."). The fact that Dr. Grant clarified her own bottom-line view did not in any way render the contents of her report unsupportive of Dr. Lally's views—her report provided clear and obvious reasons for believing that Farmer satisfied the insanity standards at the time of the offense, Dr. Grant's own uncertainties notwithstanding.

The second problem lies in the trial court's reasoning that Farmer's Rule 16 summary was insufficient because he did not explain away every factor that Dr. Grant viewed as cutting against an insanity defense, like Farmer's "goal-directed behavior" (i.e., his pursuit of two dollars) and his potential drug use around the time of the offense. But the summary required under the former Rule 16 does not require a party to detail how their expert will combat every possible counterpoint; even in its current iteration, Rule 16 requires defendants to disclose only the expert opinions they will offer in their "case-in-chief." To the extent that Dr. Grant's report highlighted some weaknesses in Farmer's insanity defense, the government was free to call its own expert to talk about those, as it had proposed to do (via Dr. Travis Flower, its own proffered expert). And the government was of course free to cross-examine Dr. Lally about those topics as well, and any other weak spots in his

opinion. *Motorola Inc. v. Murray*, 147 A.3d 751, 754 (D.C. 2016) (en banc) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)))).[4] But Farmer did not need to anticipate and preempt every possible attack on Dr. Lally's conclusion—Rule 16, particularly in its prior iteration, simply did not require so much of him.

Before addressing the government's counterpoints, let us illustrate the two points above with an analogy. Consider an NBA team with two scouts who evaluate potential players for the team to draft. The first scout provides a written evaluation that details one top prospect's relevant measurements, their college stats and performance, and is replete with upside descriptors like "natural scorer," "fluid shooting motion," "elite court vision," "great passer," and "shutdown defender."

---

[4] If the government perceived some existential problems with Dr. Lally as a witness, it could have sought to preclude his testimony on the basis that he was unqualified to offer it, but that is an entirely separate issue from Rule 16 notice and the government never called Dr. Lally's qualifications into doubt. *See United States v. Hite*, 769 F.3d 1154, 1169 (D.C. Cir. 2014) (noting that the federal Rule 16 "does not require the defendant to explain the basis of the proposed opinion's admissibility," and "requiring explanation of legal basis goes far beyond the purpose of the rule"); *see also Motorola*, 147 A.3d at 756 (explaining that an opponent of expert testimony may challenge an expert's opinions by establishing that they are not "based on sufficient facts or data" and are not "the product of reliable principles and methods" (quoting Fed. R. Evid. 702)).

But the evaluation expresses some downside concerns like "foul prone," "lack of leadership," and "questionable maturity." When addressing whether the team should draft the player with their mid-first round draft pick, the first scout's report equivocates, and says he has no definitive opinion on that but generally doubts the player is worth their first round pick—he ranks the prospect as a high second round pick. The second scout says, with no report of his own, that "I agree with everything in the first scout's report, except that we should definitely draft this guy with our first round pick if he's available." Are you left with any doubt about the second scout's opinions? Surely not. Do you understand the general bases for that second scout's opinions? Of course you do. You will no doubt have some questions about why the second scout weighed the relevant factors somewhat differently from the first scout, but it's not like the first scout's report was so down on the prospect that you're left scratching your head about why the second scout wants to draft him. The second scout has given you a summary of his opinions and the bases for them. He has just not answered every question you might have but—to break from the analogy—that's what cross-examination is for.

The government counters with a trio of cases where we determined there was a Rule 16 violation and, it suggests, those cases support the same conclusion here. We disagree. Each of those cases was far afield, as the disclosures at issue were far paltrier than this one.

The government's first case is *Miller*, a prosecution for child sex abuse where the defendant sought to call an expert to cast doubt upon the complainant's accusation of forced penetration. 115 A.3d 564. The defendant's Rule 16 notice indicated only that the expert would opine that if forced penetration had occurred as the complainant described it, that "would increase the likelihood of penetration injury" that was not apparent when the complainant was examined years after the incident. *Id.* at 567. The principal deficiency with that notice, we explained, was that it did "not communicate [the expert's] opinion . . . concerning the actual likelihood of penetration injury in [the complainant's case], where she reported her assault *two years after* it allegedly occurred." *Id.* (emphasis added). We reiterated that the notice did not "provide the government with the necessary details about *how* likely penetration injury would be, two years after the trauma, and *why* [the expert] might advance such an opinion." *Id.* at 568. The expert notice was thus shrouded in mystery, failing to disclose the basic contours of the proposed expert opinion and its sources of support. There was no similar mystery about Dr. Lally's opinions or his bases for them.

The government next relies on *Ferguson*, a case in which the defendant claimed that he shot the complainant in self-defense, and the parties hotly debated whether the complainant's gunshot wounds entered from the front (consistent with self-defense) or the back (less so). 866 A.2d 54. The government's Rule 16 notice

indicated that it "may call a treating physician," who was identified only "on the eve of trial," "to discuss [the complaining witness's medical] records" as they pertained to "the severity of [the victim's gunshot] wounds." *Id.* at 58, 64. The glaring problem with that notice was that it did not in any way identify what the expert's opinion was on the critical topic in dispute. *Id.* at 64 (The notice "could not be interpreted, even remotely, as a 'written summary' of the testimony the doctor would give at trial."). To severely compound that problem, the government's expert had told defense counsel before trial that four of the five gunshots entered from the front, which seemed to support his self-defense claim. *Id.* at 58, 64. Then in the middle of trial, after the government asked its expert to revisit his opinion, the expert flipped positions and opined that only one or two of those five gunshots had entered through the front. *Id.* at 61-62, 64-65. In that context, where the Rule 16 notice did not in any sense identify the expert's opinions and they ultimately contradicted pretrial representations, we found a Rule 16 violation. *Id.* *Ferguson*, like *Miller*, bears no resemblance to this case.

The government finally relies on *Murphy-Bey*, undoubtedly its strongest support. 982 A.2d 682. In *Murphy-Bey*, the defendant sought to call an expert on how crack cocaine can lead to violence in support of his claim that the complainant, who had recently smoked crack, attacked him first. *Id.* at 686-87. We held that

neither of the defendant's two pretrial written notices satisfied Rule 16. The first letter said only that:

> [The defense expert] may testify either by providing information or by rendering an opinion about . . . the effects of Crack Cocaine and psychiatric drugs [and] marijuana on the human mind, the combination of their use, the length of time of their effects[,] as well as the long and short-term effects of their use.

*Id.* at 687. After the government complained that this notice did not actually explain what the expert's opinions were, or the bases for them, a second defense notice added:

> [The defense expert] will be able to offer an opinion that while under the influence of the illegal drug crack cocaine and coupled with the psychotic schizophrenic drugs, a person would be frantic, nonsensical, agitated, overly hyper, and in a state of mania.

*Id.* We held that, "as in *Ferguson*," the defendant's initial notice had "fail[ed] to summarize the expert's expected testimony, fail[ed] to describe the expert's actual opinions, and fail[ed] to describe the bases for those opinions." *Id.* at 688. While we thought the second letter came "closer to summarizing [the expert's] expected testimony and her opinions," "it clearly still does not provide the bases and reasons for those opinions, nor any details of them."[5] *Id.* at 689. Farmer's Rule 16

---

[5] One curious aspect of *Murphy-Bey* is that our opinion described a third in-court disclosure that seemed to provide many of the details that were missing from the first two written disclosures, 982 A.2d at 688, but we then ignored that in-court

disclosures, complete with Dr. Grant's extensive report and highlighted sections therefrom, left no similar mystery about what Dr. Lally's opinions were or his bases for them.

This case simply does not resemble any of those cases. Unlike that trio, Farmer has always been crystal clear about what Dr. Lally's central opinion is, which is "that to a reasonable degree of psychological certainty, Mr. Farmer lacked the substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law due to mental disease or defect." His qualifications for offering that opinion are unquestioned. And the supportive bases for that opinion stood out from Dr. Grant's report and were specifically highlighted by Farmer, to wit, that: (1) Farmer suffered from multiple serious mental health problems, ranging from bipolar to schizoaffective disorders, (2) his mental decompensation led to multiple emergency hospitalizations in the weeks surrounding the shooting, (3) Farmer was found to be "hallucinating, paranoid, delusional," and to have "no insight and impaired judgment" in the days after the

---

disclosure when assessing the defendant's Rule 16 compliance, without explanation, *id.* at 688-89. It is apparent from the briefs (but not our opinion) that the in-court disclosure was made five days prior to trial, so we may have discounted it from the Rule 16 analysis based on that close proximity to trial and the government's inability to prepare based on such a late disclosure. But whatever our unstated reasons were, it is enough for us to observe that we treated that in-court disclosure as irrelevant to our Rule 16 compliance analysis, so we do likewise here.

shooting, and (4) Farmer had long presented psychotic symptoms that had never been adequately treated. Whatever questions remained about how Dr. Lally reconciled his opinion with differing perspectives was fodder for cross-examination, not grounds for precluding him from testifying where Farmer offered a written summary of his opinions and the extensive bases for them.

We are nonetheless sympathetic to the view that if a trial court identifies discrete areas of uncertainty about an expert's opinion that might lead to unfair confusion or delay in the middle of trial, it might appropriately direct a party to clarify those uncertainties. That is, after all, why Rule 16 was amended after Farmer's trial—so that parties can have a more complete preview of opposing expert opinions. But that is not what happened here, where Farmer was given no opportunity to cure any perceived deficiencies in his seemingly compliant Rule 16 notice. So as we now explain, even if we (counterfactually) agreed with the trial court's ruling that Farmer failed to comply with Rule 16, it still abused its discretion by precluding Dr. Lally's testimony without affording Farmer any opportunity to cure the perceived deficiencies.

## ii. The trial court abused its discretion when precluding Dr. Lally's testimony.

Once a trial court determines that a party has failed to provide adequate Rule 16 notice, the court may fashion a sanction in light of "(1) the reasons for the

nondisclosure; (2) the impact of the nondisclosure on the trial of the particular case; and (3) the impact of a particular sanction on the proper administration of justice in general." *Murphy-Bey*, 982 A.2d at 689 (quoting *Ferguson*, 866 A.2d at 59). Among the more lenient options, the court may simply give the offending party additional time to cure their defective notice; on the harsher end of the spectrum, it can preclude the party from calling their expert entirely; and somewhere in between, the court can always permit the expert testimony while policing it on a more granular level to ensure it does not include opinions that are out of left field and that the opposing party could not have fairly anticipated. *See* Super. Ct. Crim. R. 16(d)(2) (describing the menu of available sanctions, which includes "any . . . order that is just under the circumstances"). The appropriate sanction must be "proportionate to the nature of the party's discovery violation and its effects on the litigation." *Roe v. Doe*, 73 A.3d 132, 135 (D.C. 2013) (quoting *Bonds v. District of Columbia*, 93 F.3d 801, 809 (D.C. Cir. 1996)).

We agree with Farmer that each of the above relevant factors weighed heavily against the harsh sanction that the trial court imposed, even if he had violated Rule 16.

The trial court found that the first factor—the reasons for the nondisclosure—weighed against Farmer because he had "no good reason for [his] failure to provide

reasonable detail about the specifics of [Dr. Lally's] opinion . . . even though trial was relatively imminent." We strongly disagree with that.

There was one great reason for Farmer's failure to provide more detailed Rule 16 notice: He had already complied with the rule's requirements. And even assuming we are wrong about that, Farmer was at least substantially justified in thinking that he had complied with Rule 16, as he told the government precisely what Dr. Lally would testify to and had given it an extensive preview about the bases for that opinion.

Another good reason for any perceived Rule 16 deficiency is that the court had never previously identified any deficiency at all. This was not a case where the court highlighted some oversights or shortcomings of the Rule 16 notice and then gave Farmer a chance to correct them. Instead, while Judge Okun held a hearing after all of the Rule 16 disclosures had been made, he did not identify any apparent deficiencies in them before handing the trial assignment off to Judge Epstein. And Judge Epstein first ruled that Farmer's Rule 16 notice was deficient mere moments before definitively ruling that Dr. Lally's testimony would be precluded.

Yet another pretty good reason for one perceived deficiency is that Dr. Grant's initial report explicitly said that she too agreed with Dr. Lally's conclusion that Farmer was "significantly compromised by the presence of a mental disease or

defect" at the time of the offense. It was only when she corrected a double negative in her initial report a few days before the trial court's decision to preclude Dr. Lally from testifying that it became clear she did not ascribe to that view. So even if we were to agree with the trial court's reasoning that this change to Dr. Grant's report left the bases for Dr. Lally's opinions insufficiently clear—we have already explained why we don't agree—then Farmer was surely entitled to some time to account for that recent about-face in Dr. Grant's report.

On the second factor, regarding the impact of the nondisclosure on the trial of the particular case, we doubt it had any impact whatsoever, making the trial court's sanction particularly harsh and unwarranted. That is because the government had a reasonably complete understanding of Dr. Lally's opinions and the bases for them months before trial, so that any Rule 16 deficiency could not have seriously impeded its trial preparation at the time of the trial court's preclusion ruling. And to the extent one might discern some minor deficiencies in Farmer's Rule 16 notice, there remained plenty of time for him to cure those. The insanity phase of trial could not have begun for at least another twenty days—there is actually no indication in the record of when it was expected to start[6]—which seems like plenty of time for Farmer

---

[6] Recall that the trial court precluded Dr. Lally's testimony on February 16, eleven days before the guilt phase of trial was scheduled to begin. But Dr. Lally's

to correct any minor deficiencies that the trial court could pinpoint in his Rule 16 notice. Of course, if Farmer had failed to cure the perceived deficiencies in a reasonable amount of time, this might be a different case. But on this record, we see no good reason Farmer should not have been afforded some limited time to cure whatever Rule 16 deficiencies the trial court perceived.[7]

The third factor, concerning the impact of a particular sanction on the proper administration of justice, is where the trial court most grievously erred. The court's decision to bar Dr. Lally from testifying effectively precluded Farmer from presenting his central defense to the charges against him. Insanity defenses typically require expert testimony, given the complex task of distilling medical diagnoses and

---

testimony was not relevant to that guilt phase, and he was expected to testify only at the insanity phase of trial, which would have trailed the guilt phase. The guilt phase of trial concluded on March 7, so assuming that the trial court was intent on jumping right back into jury selection for the insanity phase of trial the following day, the second phase of trial would have begun on March 8, or twenty days after the trial court's ruling precluding Dr. Lally's testimony.

[7] The trial court seemed to reason that the government had already highlighted Farmer's Rule 16 deficiencies when it moved to compel Farmer to provide a more complete report of Dr. Lally's opinions, so that Farmer's failure to acquiesce to the government's request for more information counted against him. The obvious problem with that reasoning is that there is a world of difference between an adversarial party complaining about a perceived Rule 16 violation and a court endorsing their view. Farmer's well-substantiated belief—correct, in our view—that he had already complied with Rule 16 was reason enough for him not to comply with the government's request for more information. But we have no reason to doubt, on this record, that he would have complied with a court directive to provide more detail.

records before lay jurors, so that the "defense may be devastated by the absence of psychiatric examination and testimony." *Ake v. Oklahoma*, 470 U.S. 68, 82-83, 87 n.13 (1985) (holding that the Due Process Clause requires access to state-funded psychiatrists for purposes of establishing insanity defense). Strategically speaking, it is imperative for defendants raising the insanity defense to have "a psychiatrist whose orientation and preparation is such as to support the defense theory of the case." 1 Wayne R. LaFave, Substantive Criminal Law § 8.2(d) (3d ed. Oct. 2024 update). We of course understand why a trial court might nonetheless preclude such an expert where the defense is dragging its heels or seems to be strategically trying to frustrate an upcoming trial via inadequate disclosures, but there was not a whiff of such gamesmanship here (the government does not suggest otherwise). So the trial court's decision to cut off Farmer's central defense was an abuse of discretion where any Rule 16 violation was, at most, de minimis.

Taking those factors together, the exclusion of Dr. Lally's testimony (1) was not in response to any deficient justification for the purported lack of notice, (2) was not necessary to offset any particular disadvantage suffered by the government, and (3) had a significant and negative impact on the proper administration of justice. And overall, the sanction imposed was highly disproportionate to any violation that

occurred. The trial court thus abused its discretion when it precluded Dr. Lally from testifying.[8]

### iii. The government has not carried its burden to demonstrate harmlessness.

The government does not seem to dispute that the error in precluding Dr. Lally from testifying was harmful, and its failure to do that would normally compel reversal unless "harmlessness is obvious." *Randolph v. United States*, 882 A.2d 210, 223 (D.C. 2005) (reasoning that in the absence of any argument from the government that a legal error is harmless, we can find such errors harmless "only when harmlessness is obvious"); *see also Wheeler v. United States*, 930 A.2d 232, 246 (D.C. 2007) (government has the burden of persuasion in harmless error analysis);

---

[8] The government further counters that we should not fault the trial court for failing to give Farmer more time to cure any Rule 16 deficiencies because Farmer did not ask for an opportunity to supplement his disclosures. We disagree for three reasons. First, the government's own motion made clear that it was primarily asking the court to direct Farmer to provide a more "fulsome notice of Dr. Lally's proposed testimony"—the government suggested precluding Dr. Lally's testimony only as a backup after that opportunity to cure. Second, immediately after concluding for the first time that Farmer's Rule 16 notice was deficient, the trial court announced its sanction of precluding Dr. Lally's testimony. The court did not invite any discussion on that sanction. Third, the trial court independently acknowledged the possibility of giving Farmer time to cure any deficiencies in his Rule 16 notice, so for Farmer to echo that possibility after the court had squarely rejected it would have been utterly futile. *See Black v. D.C. Dep't of Hum. Servs.*, 188 A.3d 840, 848 (D.C. 2018) ("Even if a claim was not pressed below, it properly may be addressed on appeal so long as it was passed upon." (quoting *Rodriguez v. D.C. Off. of Emp. Appeals*, 145 A.3d 1005, 1010 n.6 (D.C. 2016))).

*Smith v. United States*, 283 A.3d 88, 99 (D.C. 2022) ("The government makes no argument that the error was harmless, and so we remand to the trial court with instructions to vacate Smith's conviction.").

But because we have some slight uncertainty about whether the government made a harmless error argument,[9] we observe that not only was the error not obviously harmless, but it was not harmless under either the *Chapman* test that we apply to constitutional errors, or the *Kotteakos* test that we apply to nonconstitutional errors. Even under the more relaxed and government-friendly *Kotteakos* test—

---

[9] There is one sentence in the government's brief that sounds like a harmless error argument: The government asserts that "it is highly unlikely that Dr. Lally's testimony would have resulted in a different outcome," had it been permitted. For three reasons, we do not understand that as an argument that any error was harmless. First, the government makes that assertion in the immediate context of explaining why (in its view) the trial court's sanction was justified, with none of the accoutrement of a harm argument; for instance, it does not use the words harm, harmless, or any derivative thereof, nor does it cite to any of the relevant harm standards that might apply here (like *Chapman* or *Kotteakos*). *See Chapman v. California*, 386 U.S. 18 (1967) (constitutional error); *Kotteakos v. United States*, 328 U.S. 750 (1946) (nonconstitutional error). Second, it seems at first blush that this error was of constitutional dimension, since it effectively cut the legs out from under the central defense theory. *See Russell v. United States*, 17 A.3d 581, 589 (D.C. 2011) ("[A]n erroneous trial court ruling that deprives a defendant of the opportunity to present non-cumulative evidence on an issue central to the defense is of constitutional magnitude and subject to harmless error analysis under *Chapman*."). Yet the government has certainly made no argument that the error here was harmless beyond a reasonable doubt under *Chapman*. Third, even if the government intended to raise a harm argument—contrary to our understanding—it did so in such a perfunctory way that we generally would not consider it. *See Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008).

assuming for the sake of argument that it applies here—we are unable to "say with fair assurance, after pondering all that happened, without stripping away the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765. Farmer had substantial support for his insanity defense, as we have detailed above, and we are not at all confident that a jury would not have credited it.

### iv. The appropriate remedy is a remand for a trial limited to insanity.

There remains the question of the appropriate remedy. While the parties did not discuss this issue in their briefs, they agreed at oral argument that the appropriate remedy is to leave the jury's guilty verdicts undisturbed, and then to provisionally vacate Farmer's convictions and remand the case for a new trial limited to the question of insanity.

We agree that is the appropriate remedy here. That is the approach we followed in *Cooper v. United States*, where we concluded that the trial court improperly directed a verdict on insanity in the government's favor after a jury found Cooper guilty of murder and larceny. 368 A.2d 554, 561 (D.C. 1977). In *Cooper*, we "vacate[d] the judgments of conviction" and "remand[ed] for a hearing on appellant's responsibility for the offenses, with the ultimate judgments to abide that finding." *Id.* We further specified that if Cooper failed to persuade the jury on his

insanity defense on remand, no new merits trial would need to be held—instead, the prior "entry of judgments of conviction . . . shall be made and appropriate sentences shall be imposed." *Id.*

Consistent with *Cooper* and the parties' joint position, we provisionally vacate Farmer's convictions, though we leave the jury's underlying guilty verdicts undisturbed. We remand for a new trial limited to Farmer's insanity defense. If the jury at that proceeding acquits Farmer by reason of insanity, Farmer's convictions should remain vacated. *Cf.* D.C. Code § 24-501 (prescribing procedures that follow acquittals by reason of insanity). If that jury rejects Farmer's insanity defense, the trial court may reinstate the judgments of conviction against him.

### B. The trial court did not reversibly err in its self-defense instructions

Farmer next complains about the trial court's decision to forgo a self-defense instruction in its initial jury instructions, and he further complains that when the court ultimately corrected that error, it erroneously gave an "initial aggressor" instruction. We consider those arguments in reverse order, beginning with the initial aggressor issue.

Whether there was sufficient evidence to support an initial aggressor instruction "is a question of law, as to which our review is de novo." *Peyton v.*

*United States*, 278 A.3d 713, 723 (D.C. 2022). The trial court may give such an instruction when "some evidence" supports it. *Tyler v. United States*, 975 A.2d 848, 858 (D.C. 2009) (upholding trial court's decision to give initial aggressor instruction that was supported by "some evidence" and consistent with "fundamental legal principles"). And here, there was unquestionably some evidence that—even if Sturdivant had been armed—Farmer was the initial aggressor. Sturdivant testified that as he and Farmer were arguing over some money, Farmer "came up with a gun," "pointed it at [him]" and "tr[ied] to open the [car] door" to get out of the vehicle. The Ring camera footage then shows—within the span of about fifteen seconds— Sturdivant trying to stop Farmer from exiting the car, Farmer following Sturdivant around the front of the car, and Farmer shooting Sturdivant as Sturdivant moves away from Farmer and up the sidewalk. The initial aggressor instruction was thus warranted on this record, and the trial court did not err in giving it.

That brings us to Farmer's second complaint, regarding the trial court's failure to initially give a self-defense instruction. We need not grapple with the merits of that argument because the trial court ultimately did properly instruct the jury on self-defense, and any error in delaying that instruction was harmless.

At the outset, the government asks us to assess harm under the test applicable to nonconstitutional errors, asking whether we can say, "with fair assurance, after

pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *See Kotteakos*, 328 U.S. at 765. We generally agree with the government's assessment that this error was not of constitutional dimension, but we need not dwell on that point because Farmer does not dispute that *Kotteakos* applies here, so we now apply that conceded standard.

We have little doubt, and conclude with fair assurance, that the trial court's delay in issuing a self-defense instruction did not sway the jury's verdict, so any error on that score was harmless. The jury had only just started deliberating when it asked the court if there was a jury instruction on self-defense, and the court promptly provided one.[10] That instruction provided an accurate statement of the law, and the court also gave the parties additional time to present their arguments about self-defense. While Farmer argues that jurors might have been entrenched in their views

---

[10] The jury deliberated for about an hour before it asked about a self-defense instruction, by our estimation, though that is tough and not terribly important to pinpoint. After closing arguments and instructions, the trial court excused the jury for lunch at 1:39 p.m. and instructed them to return for the start of deliberations after lunch. Based on the previous days' transcripts, the jurors were usually given about an hour and fifteen minutes for lunch. The jury sent their note about a self-defense instruction at 3:29 p.m., or an hour and fifty minutes after they were excused for lunch. So even if the jury took a shorter than usual lunch break—let's call it fifty minutes—they would have deliberated for just one hour before sending their note about a self-defense instruction.

prior to receiving this new instruction, that strikes us as rather unlikely, given that the jury note asked about the implications of self-defense for this case, which is hardly indicative of jurors who have drawn any foregone conclusions about that defense.

Farmer's self-defense claim was also incredibly weak, assuming he was entitled to a self-defense instruction in the first place. There was never any direct evidence that Sturdivant brandished or even had a gun—not from Farmer, who chose not to testify, or from any of the other eyewitnesses on the scene who did testify. The Ring camera footage, grainy as it is, does not appear to show Sturdivant with a gun at any point. Multiple police officers extensively canvassed the only area where it appears Sturdivant might have abandoned a gun, and they found nothing. Perhaps most fatal to Farmer's self-defense claim is that the Ring footage clearly shows Sturdivant with his back turned to Farmer and walking *away* from him just moments before Farmer raised his gun and fired three shots. And what Farmer did next is also quite telling: He did not immediately flee the scene, as one might naturally do if they had just shot an armed man. He instead sat in his car for about thirty seconds, seemingly unconcerned with Sturdivant potentially retaliating, which is a rather odd choice if he believed Sturdivant was armed.

In sum, we are very confident that that any error in the trial court's delay in providing a self-defense instruction did not impact the jury's verdicts.

### III. Conclusion

For the foregoing reasons, we provisionally vacate Farmer's convictions and remand the case for a trial limited to his insanity defense.  If he is found not guilty by reason of insanity, his convictions should remain vacated.  If a jury rejects his insanity defense, the trial court may reinstate those convictions.

*So ordered.*